IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


BRIT UW LIMITED and HISCOX
DEDICATED CORPORATE MEMBER
LIMITED,

        Plaintiffs,

v.

HALLISTER PROPERTY DEVELOPMENT,
LLC and DAVID BAERWALDE,

        Defendants.

CIVIL ACTION NO.

1:11-CV-4396-JEC

## ORDER & OPINION

This case is before the Court on plaintiffs' Motion for Summary Judgment [52].  The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiffs' Motion [52] should be **GRANTED.**

## BACKGROUND

### I.   Overview

The facts underlying this case are not in dispute.  In November 2009, defendant Baerwalde was paralyzed after being thrown from a horse he was sitting on.  The accident occurred at the Goat Farm, an Atlanta-area living and workspace community for artists.  (Compl. [1] at 6.)  Baerwalde sued several parties in connection with accident, including his co-defendant in this action, Hallister Property Development, LLC ("Hallister").  (*Id.* at Ex. B.)  At the time of the

accident, Hallister was covered by an insurance policy (the "Policy") that was issued by plaintiffs. (*Id.* at 9.)  When Baerwalde filed suit, Hallister sought coverage under the Policy. (*Id.*)

Plaintiffs subsequently filed this complaint, seeking a declaratory judgment that they have no duty to defend or indemnify Hallister in the Baerwalde action. (*Id.* at 1.)  According to plaintiffs, the Policy does not provide coverage for Baerwalde's accident because (1) the Policy was limited to Hallister's operations as a "General Contractor" and (2) Hallister failed to provide timely notice of the accident. (Pls.' Br. in Supp. of Summ. J. ("Pls.' Br.") [52] at 2-3.)  Alternatively, plaintiffs argue that the Policy should be rescinded because of Hallister's material representations during the application process. (*Id.*)

## II.  **The Policy**

The Policy provides coverage to Hallister for the period of February 12, 2009 to February 12, 2010. (Policy [52] at Ex. C.)  It contains a notice clause, which provides:

> **Section IV-Commercial General Liability Conditions**
>
> **2.    Duties In The Event Of Occurrence, Offense, Claim or Suit**
> **a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.

(*Id.* at 33.)  The term "occurrence" is defined by the Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 37.)

2

The Policy also contains a "Classification Limitation Endorsement" that states:

> Coverage under this policy is specifically limited to those operations described by the classification(s) in the Commercial General Liability Coverage. This policy does not apply to any operation not specifically listed in the Commercial General Liability Coverage or endorsed hereon.

(*Id.* at 59.) The "Commercial General Liability Coverage Part Declarations" of the Policy list the following two codes with accompanying descriptions:

| Code: | Classification: |
|---|---|
| 91580 | CONTRACTORS-EXECUTIVE SUPERVISORS OR EXECUTIVE SUPERINTENDENTS INCLUDING PRODUCTS/COMPLETED OPERATIONS |
| 91583 | CONTRACTORS-SUBCONTRACTED WORK-IN CONNECTION WITH BUILDING CONSTRUCTION, RECONSTRUCTION, REPAIR OR ERECTION-ONE OR TWO FAMILY DWELLINGS |

(*Id.* at 12.) The Policy does not further define any of the key words found in the codes or the accompanying descriptive language.

III. **Hallister's Activities at the Goat Farm**

Hallister is a limited liability corporation with two members, Christopher Melhouse and Anthony Harper. (Melhouse Dep. [48] at 124.) In April 2008, Hallister signed an agreement (the "Agreement") with the owners of the Goat Farm permitting Hallister to possess and develop the property. (Agreement [52] at Ex. H.) The Agreement was

3

intended to help Hallister determine the feasability of converting the Goat Farm property into apartment buildings with some commercial retail space.  (Melhouse Dep. [48] at 15-16 & 97-98.)

Once in possession of the property, Hallister began to build artist studios.  (Harper Dep. [47] at 105-06.)  Hallister planned to rent out the studios in order to create the necessary cash flow to qualify for a loan, and then complete its purchase and commercial development of the property.  (*Id.*)  When this more expansive plan was derailed by the recession, Hallister decided to maintain the property as an artist community.  (Melhouse Dep. [48] at 100-102.)

At his deposition, Hallister member Harper admitted to "managing the property" on behalf of Hallister.  (Harper Dep. [47] at 89.) According to Harper, Hallister's management activities included "collecting rent" and "leasing [the] property out."[1]  (*Id.*)  His fellow Hallister member, Melhouse, disavowed the characterization of Hallister as a "property manager" but he admitted that Hallister took responsibility for addressing issues with tenant live/work spaces that arose after Hallister's involvement with the property. (Melhouse Dep. [48] at 108-109.)  Although there was no formal agreement, Goat Farm's owner apparently took responsibility for

---

[1] Melhouse testified that rent was not collected for Hallister's gain during this time period and that Hallister did not maintain on office on site but the owners of Goat Farm did.  (Melhouse Dep. [48] at 108.)  According to Melhouse, tenants dropped their rent checks in a box in the owner's office and the owner came in every month to pick up the checks.  (*Id.*)

problems that preexisted Hallister's presence at there. (*Id.* at 108-110.)  The owner employed two on-site maintenance workers to complete these repairs. (*Id.* at 109-110, 124.)

## IV.  **The Accident and Underlying Lawsuit**

The Goat Farm derives its name from the fact that the property contains an animal pen with several pygmy goats, a turkey, and a sheep dog. (*Id.* at 41-42.)  Shortly before the accident, Goat Farm tenant Christina Dolan asked Harper whether she could temporarily board a horse at the Goat Farm while a more permanent home was secured. (Harper Dep. [47] at 13-14.)  Harper agreed, believing the horse could serve as a novelty item like the other animals in the pen. (*Id.* at 15.)  Ms. Dolan and her daughter were responsible for preparing the pen for the horse. (*Id.*)

Baerwalde's accident took place on the same day that Ms. Dolan brought the horse to the Goat Farm. (Baerwalde Dep. [59] at 35-36.)  Sometime after Dolan brought the horse onto the property, she offered to allow Baerwalde to sit on the horse. (*Id.*)  Melhouse was present at the time, and he helped Baerwalde mount the horse. (*Id.* at 131.)  Although Baerwalde intended only to sit and not ride on the animal, the horse immediately took off, bucked and threw Baerwalde off its back. (*Id.* at 25.)  Baerwalde collided with an old flagpole in the middle of the pen and broke his back. (*Id.*)

After the accident, Harper and Melhouse visited Baerwalde in the hospital and modified his studio to make it wheelchair accessible.

(Baerwalde Dep. [59] at 126-27, 129-30.)   The parties did not have any substantive discussions about Hallister's potential liability for Baerwalde's injuries, but Melhouse admits that at some point after the accident, Baerwalde mentioned the issue of a lawsuit "but just in passing." (Melhouse Dep. [65] at 60.)   Also during this time period, Baerwalde told Harper that he believed in the mission of the Goat Farm and would not do anything to jeopardize that.   (Harper Dep. [47] at 23.)

On September 30, 2011, defendant Baerwalde filed suit in Fulton County State Court against Hallister, Christina Dolan, and the owners of the Goat Farm.   (Baerwalde Compl. [52] at Ex. H.)   The complaint generally alleges that the facilities where defendants boarded the horse "were not adequately equipped to handle horses or horse riding." (*Id.* at ¶ 24.)   The complaint only specifically names Hallister once, when it alleges that Hallister and the owners of the property "negligently designed, developed, prepared, and addressed [the pen area] prior to permitting horse riding activities." (*Id.*)

After receiving notice of the Baerwalde complaint, Hallister requested a defense and indemnity from plaintiffs pursuant to the Policy. (Pls.' Mot. for Summ. J. [52] at Ex. I.)   The underwriters of the Policy offered to provide Hallister a defense subject to a reservation of rights. (*Id.* at Ex. J.)   When Hallister rejected their offer, plaintiffs filed this action to determine their rights and obligations to Hallister under the Policy. (Pls.' Br. [52] at

10.)

**DISCUSSION**

**I.   Summary Judgment Standard**

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).   A fact's materiality is determined by the controlling substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.   Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   In such a situation, there can be "'no genuine issue as to any material fact,'" as "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  *Id*. at 322-23 (quoting FED. R. CIV. P. 56(c)).

7

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is required to "go beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

In ruling on a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48 (1986). The requirement is that there be no "*genuine* issue of *material* fact." *Id.*

## II. Classification Limitation Endorsement

### A. Legal Standard

Under Georgia law, an insurance policy is interpreted in accordance with the same rules that are applicable to other types of contracts. *SawHorse, Inc. v. S. Guar. Ins. Co. of Georgia,* 269 Ga. App. 493, 494-95 (2004). The parties to an insurance contract are bound by its plain and unambiguous terms. *Id.* at 494. Any

8

ambiguities in a policy are construed against the insurer, as the drafter of the contract. *Id.  See also Pilz v. Monticello Ins. Co.,* 267 Ga. App. 370, 371-72 (2004)("Under the rules of contract construction, the policy is construed against [the insurer] as the drafter of the policy").  However, if the policy is not ambiguous, the Court must apply its terms as written. *SawHorse,* 269 Ga. App. at 495.

An insurer's duty to defend an insured in a lawsuit is determined by comparing the allegations of the complaint against the insured with the provisions of the policy. *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.,* 297 Ga. App. 751, 754 (2009).  If the complaint asserts a claim that is potentially covered by the policy, the insurer has a duty to defend the insured in the lawsuit. *Id.* Only if the complaint unambiguously excludes coverage is the insurer excused of its duty to defend. *Id.  See also Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.,* 268 Ga. 564, 565 (1997)(explaining that an insurer has a duty to defend unless the factual allegations in the complaint show that there is no coverage under the policy).

**B.  <u>Coverage Limitations</u>**

Applying Georgia law, the Court agrees with plaintiffs that the Policy does not cover Baerwalde's accident.  The Policy's Classification Limitation Endorsement ("Limitation Endorsement" or "Endorsement") expressly limits coverage to "those operations described by the classification(s) in the Commercial General

9

Liability Coverage." (Policy [52] at 59.) The referenced classifications, which are listed in the Commercial General Liability ("Declarations") Coverage Part Declarations, both relate to "building construction, reconstruction, repair or erection" of "one or two family dwellings." (*Id.* at 12.) Specifically, code 91583 covers "Contractors - Subcontracted Work - In Connection with Building Construction, Reconstruction, Repair or Erection - One or Two Family Dwellings." (*Id.*) Code 91580 covers "Contractors - Executive Supervisors or Executive Superintendents Including Products/Completed Operations." (*Id.*) These codes are in accordance with the Policy's immediately preceding business description of Hallister as a "General Contractor." (*Id.*)

The Court is unpersuaded by Baerwalde's argument that the Limitation Endorsement is somehow ambiguous because the Policy uses the term "Commercial General Liability" on both the Declarations page and as the title to various generic provisions of the Policy. (Baerwalde Resp. [58] at 16.) According to Baerwalde, the appearance of the term in two different places causes confusion about where to locate the limiting classifications and essentially renders the Endorsement void. (*Id.* at 16-17.) However, the Endorsement specifies that the Policy is limited by the "classification(s) in the Commercial General Liability Coverage." (Policy [52] at 59.) The Declarations page is the only section of the Policy that contains any classifications. (*Id.* at 12.) The Court thus finds that the

10

Endorsement is sufficiently specific about where the limiting classifications can be found.

Furthermore, it is readily apparent that Baerwalde's claims against Hallister do not come within any reasonable interpretation of the limiting classifications. (Baerwalde Compl. [52] at Ex. H.) Baerwalde seeks to impose liability on Hallister based on its maintenance of the goat pen and control over the social and/or recreational activities taking place on the Goat Farm at the time of the accident. (*Id.* at ¶ 24.) Specifically, Baerwalde contends that Hallister was negligent in failing to (1) determine Baerwalde's ability to ride and safely manage the horse and (2) keep or make the premises safe for horse-riding. (*Id.*) These actions are not in any way related to general or subcontracting in connection with the construction of dwellings at the Goat Farm.

Given the clear import of the Policy language, the Court rejects Hallister's argument that the terms "supervisors" or "superintendents," as used in code 91580, encompasses Hallister's role as a property manager at the Goat Farm. (Hallister Resp. [62] at 9-11.) Hallister's construction of the Policy language is flawed because it defines the terms "supervisors" and "superintendents" without any reference to the immediately preceding and qualifying term "contractor." Essentially, Hallister is requesting that the Court expand the bounds of the Policy by defining "supervisors" and "superintendents" in isolation, and without consideration of the

11

surrounding terms in the Policy. That approach conflicts with Georgia contract law. *See Auto-Owners Ins. Co.,* 297 Ga. App. at 754 (when construing an insurance policy, the court "must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with each other").

The Court likewise rejects Baerwalde's suggestion to follow the approach taken in an allegedly analogous case, *United States Underwriters Ins. Co. v. United Pac. Assoc., LLC*, 2006 WL 1329756 (E.D.N.Y. 2006)(Bianco, J.). Citing Judge Bianco's decision in *United Pacific,* Baerwalde argues that plaintiffs can be liable for Hallister's "property managing" activities as long as Hallister was also acting as a general contractor. (Baerwalde Resp. [58] at 18-19.) As plaintiffs point out, such an approach would eviscerate the terms of the Limitation Endorsement and potentially require coverage for all sorts of activities that are expressly excluded by the Policy.

In fact, the rule in *United Pacific* is less expansive than Baerwalde suggests. The insurance policy at issue in *United Pacific* contained a classification limitation with accompanying code descriptors for "Carpentry" and "Carpentry-Interior." *United Pacific*, 2006 WL 1329756 at *3-4. The underlying lawsuit alleged injury resulting from the insured's removal of snow from the sidewalk in front of the building they were working on. *Id.* Judge Bianco denied the insurer's summary judgment motion based on the

12

classification limitation, finding that issues of fact remained about whether the snow removal on the date of the accident was in support of the covered carpentry operations. *Id.* at *5. Notably, there was evidence in *United Pacific* that workers regularly removed snow in front of the building so they could access it for interior work. *Id.* at *1.

Baerwalde does not claim that Hallister's alleged negligence was related to or in support of its construction activities, so the rule of *United Pacific* does not apply. Indeed, this case is more akin to two cases that were distinguished by Judge Bianco in *United Pacific.* In *Ruiz v. State Wide Insulation and Constr. Corp.*, 703 N.Y.S.2d 257 (N.Y. App. Div. 2000), the court found that coverage was precluded by a classification limitation for "painting" where the injured party was hurt while repairing a roof. And in *Mount Vernon Fire Ins. Co. v. Chios Constr. Corp.,* 1996 WL 15668 (S.D.N.Y. 1996)(Sotomayor, J.), then-Judge Sotomayor found that coverage was precluded by a classification limitation for "Carpentry-Interior" because, although carpentry tasks were being performed on-site, the work at issue was not "remotely related to interior carpentry." The same is true in this case.

Just as in *Chios*, Baerwalde's claims are excluded from the Policy's coverage by the clear and unambiguous language of the Endorsement. As the Policy does not cover the type of activity that Hallister was engaged in at the time of the Baerwalde accident,

13

plaintiffs are entitled to a declaratory judgment in this action. Accordingly, plaintiffs' motion for summary judgment [52] is **GRANTED**.

### III. <u>Notice</u>

Even assuming coverage under the Policy is available, plaintiffs still are entitled to summary judgment. As indicated above, the Policy requires as a condition of coverage that the insured give notice to its insurer "as soon as practicable of an 'occurrence' or an offense which may result in a claim." (Policy [52] at Ex. C, 33.) Failure to comply with such a notice provision bars coverage under Georgia law. *See Eells v. State Farm Mut. Auto. Ins. Co.,* 752 S.E. 2d 70, 72 (Ga. App. 2013)("It is well established that a notice provision expressly made a condition precedent to coverage is valid and must be complied with, absent a showing of justification."). While the "as soon as practicable" language affords some leeway as to timing, it is generally recognized that a two year delay in providing notice "is unreasonable delay as a matter of law." *Lankford v. State Farm Mut. Auto. Ins. Co.,* 307 Ga. App. 12, 15 (2010). *See also Protective Ins. Co. v. Johnson*, 256 Ga. 713 (1987)(17-month delay) and *Kay-Lex Co. v. Essex Ins. Co.,* 286 Ga. App. 484 (2007)(12-month delay).

Hallister's principal Melhouse witnessed Baerwalde's accident. (Baerwalde Dep. [59] at 131.)  It is therefore undisputed that Hallister learned of the accident as soon as it occurred in November, 2009. (Baerwalde's Resp. [58] at 19.) Yet, Hallister did not notify

plaintiffs of the accident until Baerwalde filed the underlying complaint in September, 2011. (Pls.' Mot. for Summ. J. [52] at Ex. I.) In the absence of a justifiable or legally sufficient excuse, Hallister's two-year delay in providing notice bars coverage under the Policy. *Lankford*, 307 Ga. App. at 15.

In an attempt to justify the delay, Hallister submits affidavits from Harper and Melhouse.[2] Both Harper and Melhouse explain that they did not notify plaintiffs of the Baerwalde accident because they did not believe Hallister was liable for Baerwalde's injuries. (Harper Aff. [64] at ¶¶ 5-7 and Melhouse Aff. [63] at ¶¶ 5-7.) Specifically, Harper and Melhouse state that: (1) Hallister did not encourage or tell Baerwalde that it was safe to ride the horse, (2) Hallister did not own the horse, and (3) the dangers of the goat pen were "open and obvious." (Harper Aff. [64] at ¶¶ 5-8 and Melhouse Aff. [63] at ¶¶ 5-8.)

Assuming the above statements are true, they are legally insufficient to excuse Hallister's delay in providing notice. The Policy expressly requires notice of any occurrence that "*may* result in a claim." (Policy [52] at 33.) Its plain language thus precludes an insured from withholding notice based on its unilateral assessment

---

[2] Plaintiffs request that the Court disregard these affidavits as contrary to prior deposition testimony. (Pls.' Reply [65] at 9.) This circuit "require[s] a court to find some inherent inconsistency between an affidavit and a [prior] deposition before disregarding the affidavit." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). There is no "inherent inconsistency" here. The Court will thus consider the affidavit testimony.

15

of the liability issues arising from an occurrence. *See Richmond* v. *Georgia Farm Bureau Mut. Ins. Co.*, 140 Ga. App. 215, 220 (1976)("Justification for failure to give notice as soon as practicable . . . may not include the insured's conclusion 'that he was free of fault and that there was no liability to the other party.'") (quoting *Bituminous Cas. Corp. v. J.B. Forrest & Sons, Inc.*, 132 Ga. App. 714, 717 (1974)). Indeed, the insured's potential liability "'is the very issue which the company must have reasonable opportunity to investigate with promptness, and which requires a prompt notice of the occurrence.'" *Id.* *See also Ill. Union Ins. Co. v. NRI Constr. Inc.*, 846 F. Supp. 2d 1366, 1371-72 (N.D. Ga. 2012)(Forrester, J.)(noting the investigatory purpose of prompt notice provisions).[3]

Harper also attests that he did not expect Baerwalde to file a claim because of Baerwalde's statement that he "believed in the Goat Farm's mission" and would not do anything to "jeopardize" the Goat Farm. (Harper Aff. [64] at ¶ 9.) This explanation is similarly deficient in that it relies on Harper's independent assessment of Hallister's likely liability in the case. Again, the Policy mandates that an insured give notice of any occurrence that "*may* result in a claim." (Policy [52] at 33.) Harper's assumption that Baerwalde would not bring a claim is insufficient under the plain language of

---

[3]   Baerwalde, Harper and Melhouse were all unable to fully respond to certain deposition questions because they could not remember when conversations or specific events occurred.

the contract, and under settled Georgia law, to excuse Hallister's two-year delay in providing notice to plaintiffs. *Richmond*, 140 Ga. App. at 220.

Moreover, Melhouse admits that he was always aware of the possibility of litigation arising from Baerwalde's accident. (Melhouse Dep. [65] at 60.)  When discussing Hallister's response to the accident, Melhouse mentioned that he wanted to help Baerwalde because it would be "[v]ery difficult to be able to say, look, I'm not going to do anything nice for you, our friendship ends now *because the potential of a lawsuit is there*." (*Id.* at 126)(emphasis added).  Even viewing this testimony in the light most favorable to defendants, it is clear that Hallister's principals, like any reasonable people, were aware of the potential for liability arising from the Baerwalde accident as soon as the accident occurred.

Finally, the Court rejects Hallister's argument that plaintiffs should be required to come forth with affirmative evidence of prejudice caused by the delay. (Hallister Resp. [62] at 16.)  This argument is simply a misstatement of the law.  Georgia law does not require an insurer to show prejudice in order to avail itself of a notice provision. *See Canadyne-Georgia Corp. v. Cont'l Ins. Co.*, 999 F.2d 1547, 1557 (11th Cir. 1993)(Georgia law does not require an insurer to demonstrate prejudice to avail itself of a notice requirement).

In sum, Hallister's two-year delay in notifying plaintiffs of

17

the Baerwalde accident is unreasonable as a matter of law.  Hallister has not provided any legally sufficient justification for the delay. Hallister's failure to comply with the notice provision therefore precludes coverage under the Policy.  For this additional reason, plaintiffs' motion for summary judgment [52] is **GRANTED.**[4]

## IV.  **Punitive Damages Provision**

Plaintiffs also seek a declaratory judgment that the Policy's punitive damages exclusion bars coverage for punitive damages. (Pls.' Br. [52] at 23.)  Defendants agree that the Policy does not cover punitive damages.  (Baerwalde's Resp. [58] at 25 and Hallister's Resp. [62] at 7.)  Its language clearly excludes claims "of or indemnification for punitive or exemplary damages."  (Policy [52] at 19.)  Accordingly, the Court specifically **GRANTS** plaintiffs' motion [52] with respect to punitive damages.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiffs' Motion for Summary Judgment [52].


SO ORDERED, this 13th day of March, 2014.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

---

[4]  As the Court has ruled in favor of plaintiffs on the coverage issue, it is unnecessary to consider whether the Policy is void as a result of Hallister's misrepresentations in applying for it.

18